2025 IL App (1st) 250251-U

Fourth Division
Filed May 1, 2025

No. 1-25-0251B

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the |
|     Plaintiff-Appellee, | Circuit Court of Cook County |
|     v. | No. 24 CR 0531301 |
| MAKEITA THOMAS, | The Honorable James Bryan Novy, |
|     Defendant-Appellant. | Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1  *Held*: The circuit court's order for continued detention was affirmed where evidence showed that continued detention was necessary to avoid the safety threat posed by defendant.

¶ 2  Defendant Makeita Thomas appeals the circuit court's order continuing pretrial detention pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-1 *et seq.* (West 2022)) as amended by Public Act 101-652 (eff. Jan. 1, 2023). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Thomas is currently in pretrial detention pending trial on charges of attempted murder, aggravated battery with a firearm, aggravated assault, and aggravated unlawful use of a weapon.[1] At her initial appearance in May 2024, the State sought to deny her pretrial release, and the court held a detention hearing. The parties proceeded by proffer.

¶ 5        According to the State's proffer, which was based largely on the statements of the alleged victims, Thomas was estranged from her mother, Nikia Tucker, and also did not get along with Tucker's boyfriend, Darryl Davis. During a funeral that all three attended in December 2023, Thomas put her hand in the shape of a gun and mimicked shooting at Davis, who interpreted the action as a threat. That same month, Thomas sent a text message to Tucker saying that she had dreamed that Tucker had gotten killed and was unhappy when she woke up and realized it had only been a dream. At some point—it is not clear precisely when—Thomas had broken the windshield of Davis's car. At another point, Tucker had overheard Thomas asking a friend to order a gun for her off the internet, and Tucker had also seen pictures and videos online where Thomas was posing with a gun.

¶ 6        On the morning of February 27, 2024, Tucker and Davis went to a laundromat. At some point, Davis saw Thomas enter the laundromat with another individual. Davis informed Tucker of Thomas's arrival, and Tucker told him he "didn't [need to] pay them any more attention." Later, Davis saw Tucker talking with Thomas. Tucker told Davis she thought Thomas had a gun and "that he should watch his back." Tucker believed Thomas "wanted to fight her," so Davis and Tucker left the laundromat. Davis walked towards his vehicle, which was parked across the street. Tucker and Thomas started arguing, and Thomas "flash[ed]" a gun, but did not remove it. At that point, Davis yelled at Thomas, "What are you doing and why are you trying to fight your mom?" Davis and Thomas continued arguing, and she approached him until they were "standing chest to chest."

---

[1]    The indictment is not included in the record on appeal, but it is available from the clerk's electronic docketing system, so we take judicial notice of it.

Tucker ran over to where they were and Thomas drew her gun from either her pants or her purse. She pointed it at Tucker's face and pulled the trigger. The gun jammed, and Davis pulled Thomas away from Tucker. Thomas then aimed the gun at Davis and shot him in the stomach. Surprised, Davis said that he could not believe she had shot him. Thomas responded, "Anybody can get it," and shot him again, this time in the arm. After he fell to the ground, Thomas aimed the gun at Tucker and then ran away.

¶ 7        This incident occurred at approximately 11:21 a.m. and was captured on surveillance camera. A security guard from a nearby business heard the gunshots and ran to aid Davis. At the scene, investigators found shell casings and one fired bullet. Davis's injuries had required five surgeries to date—three to repair his organs, and two to replace shattered bone in his arm—and he was expected to undergo more to repair nerve damage.

¶ 8        Thomas's criminal history before the incident was limited to a 2019 arrest for domestic battery involving a different alleged victim. She failed to appear one time while that case was pending. The record does not disclose the ultimate disposition of that charge.

¶ 9        The State argued that the proof was evident or the presumption great that Thomas committed an eligible detainable offense and that she posed a real and present safety threat to the community based on the facts of this case. Further, there were no condition or combination of conditions that could mitigate this risk because she possessed a firearm and had shot someone in the middle of the day at a laundromat, neither of which would be prevented by electronic monitoring.

¶ 10       The defense proffered that Thomas was 26 years old and lived on her own, apart from the alleged victims. She had completed high school and was steadily employed, working 30 hours per week in the nutrition department of a hospital. Between the date of the alleged incident and Thomas's arrest, she had not been arrested for any other reason, and there were no allegations that she had committed a crime during that period. According to counsel, Thomas denied seeing her mother since the start of the year, going to the laundromat, and engaging in the charged conduct. Additionally, the defense proffered that there had been domestic incidents between Davis and Tucker and that Tucker had, at some point, had "a case put against" him.

¶ 11        In a short rebuttal, the State proffered that Tucker had identified herself, Davis, and Thomas in still images taken from security footage depicting the incident.

¶ 12        A representative from pretrial services informed the court that their assessment corresponded with release on level 3 conditions.

¶ 13        Before the court made its findings, at the request of the State, it entered an emergency order of protection on behalf of Tucker. Among other things, it required Thomas to stay away from Tucker and Tucker's home, and it prohibited Thomas from contacting Tucker.

¶ 14        The court then granted the detention petition. It found that the State had shown by clear and convincing evidence that Thomas had committed the detainable offense of attempted murder; that her alleged conduct—firing multiple shots in public in the middle of the day—demonstrated that she posed a real and present threat to the safety of Tucker, Davis, and the public generally; and that Thomas's ability to obtain a gun, her willingness to use it, and her "troubling" denial of any involvement despite the incident being captured on video meant that no set of release conditions could mitigate the threat that she posed.

¶ 15        Following the detention hearing, the State filed a superseding indictment, and the case was transferred from the Domestic Violence Division to the Criminal Division. At a pretrial status hearing in July 2024, at the request of the defense, the court held what it termed a "detention hearing." Again, the parties proceeded by proffer.

¶ 16        The defense went first. Except for Thomas's initial denial of any interaction with her mother or involvement in the incident, the defense repeated the facts it had proffered at the original detention hearing. Additionally, the defense proffered that Thomas was a lifelong Chicago resident, that she had close relationships with two of her sisters who lived in Chicago, and that she had been in contact with her landlord, who was willing to permit her to continue living at her apartment if she were released on electronic monitoring. It proffered that Thomas's job at the hospital had required her to undergo a rigorous screening process, including drug testing and interviews, because she worked with patients directly. To provide context for the charged incident, the defense proffered that Davis was, according to the police, a member of the Vice Lords with 39 arrests and

6 felony convictions on his record. Further, Davis had subjected Tucker to domestic violence, leading to police involvement at some point, and the strain in Thomas's relationship with Tucker arose out of those circumstances. Finally, the defense proffered that, according to the information it had received in discovery, Thomas had crossed paths with Tucker and Davis at the laundromat coincidentally; she had not been out looking for them.

¶ 17 The State recounted the facts from its previous proffer, adding that the encounter at the laundromat was the first time that Tucker and Thomas had communicated since Thomas's December 2023 text messages about dreaming that Tucker had been killed. It also asserted that, after shooting Davis, Thomas fired one more shot (which did not hit anybody) before fleeing at the sound of sirens.

¶ 18 After hearing the parties' proffers and arguments, the court found that the proof was evident and the presumption great that Thomas had committed a detainable offense, that she posed a real and present threat to the alleged victims that also put the community at risk, and that nothing short of detention could mitigate that threat given that she had fired a gun at the alleged victims in public and that she had "no business having a firearm" because she did not have a FOID card or a concealed-carry license. It therefore found that Thomas "should be detained and will be detained."

¶ 19 On January 8, 2025, Thomas filed a motion for relief under Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024). The court denied the motion, and Thomas appeals.

¶ 20 II. ANALYSIS

¶ 21 Thomas did not file a memorandum in this court, so her motion for relief serves as her argument on appeal. Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). Although Thomas's notice of appeal indicates that she is appealing from both the May and July detention orders, her motion for relief only challenges the court's continued-detention decision in July, waiving any challenge to the court's original determination denying pretrial release in May. See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024).

¶ 22    Where a defendant has previously been ordered detained, at each subsequent court appearance, the circuit court "must find that continued detention is necessary to avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or to prevent the defendant's willful flight from prosecution." 725 ILCS 5/110-6.1(i-5) (West 2022). "The Code does not require the court to again make specific findings that the State proved the three propositions by clear and convincing evidence as required at the initial hearing." *People v. Casey*, 2024 IL App (3d) 230568, ¶ 13. At a continued detention hearing, the court starts from the premise that detention was necessary to guard against the threat posed by the defendant and "asks whether anything has changed such that a defendant's detention is no longer warranted." *People v. Thomas*, 2024 IL App (1st) 240479, ¶ 14. The finding, as required by section 110-6.1(i-5), is "a less demanding standard than what is required at the detention hearing, though both are concerned with fundamentally the same question." *Id.*

¶ 23    "[W]hen the parties to a pretrial detention hearing proceed solely by proffer, the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *People v. Morgan*, 2025 IL 130626, ¶ 54. While Morgan involved an initial petition for detention, not a continued-detention determination, its reasoning applies equally to hearings on continued detention where the parties again proceed solely by proffer, so we will review the circuit court's findings *de novo*. See *People v. Wilson*, 2025 IL App (1st) 242454-U, ¶ 21 (reviewing continued- detention order *de novo* under *Morgan*).

¶ 24    In her motion for relief, Thomas argues that the circuit court erred in ordering her continued detention because detention was not necessary to avoid a real and present threat to the safety of any person or the community and because there were release conditions that could ensure that she would not pose a threat upon release. Specifically, she argues that (1) she does not pose a safety threat because she was acting in self-defense, (2) she has no criminal history, (3) there was an order of protection prohibiting her from contacting Tucker and Davis, (4) GPS monitoring would assure

her compliance with the order of protection, and (5) Thomas did not contact either alleged victim or commit any crimes during the two-month period between the charged incident and her arrest.

¶ 25    At the continued detention hearing, the court's task was to determine whether any new information had come to light that undermined the original conclusion that detention was necessary. *Thomas*, 2024 IL App (1st) 240479, ¶ 14; see *People v. Walton*, 2024 IL App (4th) 240541, ¶ 29 ("If a court has found that a defendant qualifies for detention and no new information or change in circumstances is presented, it makes little sense to think that court would reverse its prior ruling for no particular reason."). Here, the circuit court initially found that Thomas posed a real and present safety threat that no set of conditions could mitigate. That determination was supported by the facts proffered at the initial hearing, which showed that, in a public setting at midday, Thomas drew a gun, tried to shoot it at Tucker, turned it on Davis when he tried to intervene, and then shot him twice—pausing between shots to taunt him—before fleeing at the sound of approaching sirens. That incident, which could have proven fatal to both Tucker and Davis, was preceded by Thomas making a not-so-subtle threat to shoot Davis and, in a text message to Tucker, expressing her disappointment that Tucker was not dead. Notwithstanding Thomas's lack of a criminal history, avoidance of further violent confrontations before her arrest, and gainful employment at a hospital, these facts easily showed that her release risked putting Tucker, Davis, and any unlucky bystanders in danger, and the nature of that danger was one that would not be adequately addressed through even stringent release conditions, especially given her apparent willingness to purchase a firearm illicitly.

¶ 26    The question, then, is whether new information presented at the July hearing undercut the initial determination that detention was necessary. At the second hearing, Thomas proffered the following new facts:

- She was a lifelong Chicago resident.
- She had a good relationship with two of her sisters, who also lived in Chicago.

- Her landlord was willing to allow her to live at her apartment while on pretrial release.

- Her job had required her to survive a rigorous screening process.

- Davis was a gang member with a history of criminal activity and domestic violence.

- The incident arose out of an unexpected meeting, not a planned confrontation.

As for dangerousness, the only one of these points that might carry any significant weight is Thomas's awareness of Davis's history, which might explain what would otherwise appear to be an uncalled-for escalation of a conflict that, to that point, had only been verbal. But it does nothing to explain Thomas's alleged conduct directed at *Tucker*. According to the State's proffers, when Thomas drew her gun, she did not immediately shoot Davis—she pointed it at her mother's face, and she pulled the trigger. But for the happenstance of a misfire, Tucker might have been killed in that parking lot. Nothing new has been proffered to show that Thomas no longer poses a threat to Tucker's safety. And as for the efficacy of release conditions, the court had already been made aware at the initial detention hearing that Thomas had a steady job and lived independently. The new information added nothing of significance to that, so there was no reason for the court to disregard the previous determination that the threat Thomas posed was not adequately mitigated by even restrictive release conditions.

¶ 27    At minimum, the record in this case shows that, as of July 2024, Thomas's detention was still needed to protect Tucker from her. We therefore agree with the circuit court that, under the circumstances of this case, Thomas's continued detention remained necessary "to avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." See 725 ILCS 5/110-6.1(i-5) (West 2022).

¶ 28                                 III. CONCLUSION

¶ 29         Based on the foregoing reasons, we affirm the circuit court's order continuing Thomas's pretrial detention.

¶ 30         Affirmed.