2025 IL App (1st) 251811-U

SECOND DIVISION
December 15, 2025

No. 1-25-1811B

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 24CR12344 |
| | ) | |
| DIMITRI SANDERS, | ) | Honorable |
| | ) | Tyria B. Walton, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's order for defendant's continued detention affirmed where no new information was presented that undermined the original conclusion that defendant's detention was necessary.

¶ 2    Defendant, Dimitri Sanders, appeals an order for his continued pretrial detention.

¶ 3    The record on appeal shows that on November 17, 2024, defendant was arrested and charged with two counts of first degree murder and one count of attempted first degree murder.

Those charges were based on allegations that, after getting into a verbal altercation with a woman ("Witness One") on a residential Chicago street, defendant shot the woman's 59-year old mother ("Victim One") and her 30-year old sister ("Victim Two").[1] Victim One died from her injuries.

¶ 4    On November 20, 2024, the State filed a verified petition for a detention hearing, and the court held a hearing that same day before the Honorable Susana Ortiz. At the hearing, Pretrial services stated that defendant had a "New criminal activity scale 2; failure to appear scale 2; new PSA score coincides with pretrial supervision level 3."

¶ 5    The State proffered that around 11:30 pm on July 4, 2024, Witness One was outside of her family home in Chicago looking for eyeglasses that she thought she lost on the sidewalk, while Victim One was inside the home. As she searched, defendant approached, along with defendant's sister. Defendant and Witness One got into a "verbal altercation" which "eventually de[-]escalated." Defendant and his sister walked away, and stood on a nearby corner.

¶ 6    Shortly after, Witness One's sister, Victim Two, returned home, along with another sister ("Witness Two"). Victim One emerged from the home. Witness One began telling her mother and sisters about what had happened. As they were talking, defendant and his sister returned, and defendant "charge[d] at" Witness One. Victim One held Witness One back, "trying to stop any kind of physical fight."  Fearing that her mother and sister were going to get hurt, Victim Two, a valid Firearm Owner's Identification Card ("FOID") and Concealed Carry License ("CCL") holder, took out a firearm from her purse. Victim Two pointed the firearm at defendant, and told him to leave the area.

---

[1] During the initial hearing, the victims and witnesses were referred to by number. In this appeal, we will continue to refer to them using the terms that were used at that hearing.

¶ 7     Defendant and his sister began to walk northbound away from the group. Victim Two then put her firearm back in her purse, and turned around, facing the opposite direction of where defendant and his sister walked.

¶ 8     As the women stood outside, facing away from defendant, "shots r[a]ng out." Neighbors, who had come outside during the earlier commotion, observed defendant shooting a firearm in the direction of the victims.

¶ 9     Upon hearing the gunshots, Victim Two began "to run southbound opposite of where the defendant [wa]s shooting and realize[d] that she'[d] been shot." She was transported to an area hospital where she was treated for a gunshot wound to her lower back.

¶ 10    Victim One sustained a gunshot wound to her inner left thigh and a gunshot wound to the back of her head, causing her death.

¶ 11    Following the shooting, Witness Two noticed pain in her back. The day after the shooting, she realized that she had a bullet fragment buried in her skin on her back. She did not seek medical treatment but took pictures. Defendant was not charged in connection with her injuries.

¶ 12    During the ensuing investigation, three nine-millimeter shell casings were located at the scene of the shooting. Chicago Police Department firearm lab preliminary analysis showed a high probability that the casings were fired from the same firearm.

¶ 13    A cell phone was also located on the scene. Although the record is not clear as to the ownership of that phone, the State asserted that when officers found it, they saw the screen light up and observed an incoming call from "Dimitri." The police then received an anonymous call identifying the shooter as defendant.

¶ 14 Thereafter, officers placed defendant into a photo array. Three witnesses from the scene positively identified defendant as the shooter. Defendant's sister was also identified by multiple witnesses as the person who was with him that night.

¶ 15 During the course of the police investigation, a search was conducted on defendant's phone number. Cell tower data showed defendant's phone number connected to a cell tower in the vicinity of the homicide at the time of the incident.

¶ 16 Defendant was arrested on November 17, 2024. At the time of his arrest, defendant was in possession of a phone. Police officers executed a search warrant on the phone. The subsequent forensic analysis of the phone revealed internet searches on October 30, 2024, for "how long does it take CPD to solve a murder"; "what do police need to solve a murder"; and "Chicago 4th of July homicides." Another internet search was completed on November 12, 2024, for "are family members credible in criminal cases." The phone also contained a screen shot of a post regarding the death of Victim One from a "Facebook page for a business that is titled legal help firm."

¶ 17 The State further explained that defendant's criminal background included an arrest in 2021 for a Class 4 aggravated unlawful use of a weapon (UUW). "That matter was ultimately reduced to a misdemeanor and he received time considered served."

¶ 18 Based on the above proffer, the State argued the proof was evident and the presumption great that defendant committed the detainable offense of first degree murder, and that he posed a real and present threat to the safety of a person, persons, or the community. The State noted that defendant began to fire on the group when they were walking away, and that "[a]ny person who is firing a gun in a neighborhood at people on a holiday shows no regard for human life and is clearly a danger in our community." And although Victim Two had previously displayed a firearm, that firearm was back in her purse at the time of the shooting, and it was no longer a threat.

4

¶ 19    Finally, the State asserted that there were no conditions the court could impose to mitigate the threat defendant posed. The State asserted that, "Although this defendant is not a convicted felon," he had been charged with a felony, and the "case was pending for two years before disposition to a misdemeanor." Defendant had also shown "clear disregard for the rules," by possessing a firearm without a FOID or CCL. The State argued that the most restrictive condition of release available to the court was electronic monitoring, but electronic monitoring would not protect the community because defendant

> "would have two days of unfettered unrestricted access in the community where the band would just tell us where he had been. It does nothing to stop crime. It does nothing to stop him from having a gun. It does nothing to stop him from getting in altercations with individuals and it does nothing to protect the community."

¶ 20    In response, counsel for defendant argued that the identifications were not reliable, because Victim Two was "unable to make a positive identification" of defendant, and both Witness One and Witness Two identified defendant, but they were "not a hundred percent sure." Counsel also noted that the witnesses and victims were "related," and that that there "may be some bias here." Although they claimed the gun was put away before defendant started shooting, "[t]here may be a different story" and "there may be some self-defense down the line."

¶ 21    Defense counsel further asserted that defendant had "no violence in [his] background" since the aggravated UUW charge "was dropped down to a misdemeanor" offense. Counsel also stated that defendant was in the military and was honorably discharged. Counsel contended that defendant should be released on electronic or GPS monitoring, which would give "sheriffs *** unfettered access to where he is residing."

5

¶ 22    Regarding mitigation, defense counsel asserted that defendant was a 25-year old lifelong resident of Cook County, he lived with his mother, he was engaged, and he had a child "on the way." Defendant worked for the "department of defense" during the week, and as an "unarmed security guard" on weekends.

¶ 23    In ruling, the court explained that the State bore the burden at the hearing, but that the "standard before the court at this time is not proof beyond a reasonable doubt. That is for trial."

¶ 24    Based on the State's proffer, the court found that the State had met its burden to show by clear and convincing evidence that defendant committed the charged offenses. The court explained that a phone was found at the scene with an incoming call from "Dimitri," that defendant was identified as the shooter, and that internet searches on his phone showed he had a "key interest" in the crime and its investigation.

¶ 25    The court also found that defendant posed a real and present threat because the proffer showed that the shooting happened after "an argument over a pair of glasses something miniscule on the street." Defendant was "extremely aggressive," he returned after the initial altercation, and he "lunged toward and was about to attack one of the other women to the point" that Victim Two "was so fearful that [she] displayed [her] lawfully possessed weapon in order to get [defendant] to not physically attack" one of the women. Defendant then shot the victims on a public street when their backs were turned.

¶ 26    Finally, the court found that there were no less restrictive conditions that could mitigate the threat defendant posed because electronic monitoring or GPS were "not fail safe" and there was "no immediate ability to apprehend. Should there be a violation they can be ignored, cut off, or simply walked away from." The court also stated that defendant could "abscond if he chose to," and that those conditions would not prevent defendant "from obtaining more weapons."

¶ 27     Following the hearing, the court entered a written order consistent with the above findings. Defendant did not appeal that order.

¶ 28     Approximately six months later, on May 27, 2025, defendant filed a petition for pretrial release. The Honorable Tyria B. Walton held a continued detention hearing on defendant's motion on June 12, 2025.

¶ 29     At that hearing, defense counsel asked the court to "review the previous order of detention" because the prior order was "not supported by clear and convincing evidence." Defense counsel asserted that "arguably the circumstances give rise to actions based on a justifiable use of force in defense of oneself or of others involved in this situation."

¶ 30     Defense counsel also stated that

> "since his time in Cook County Department of Corrections, [defendant has] had no disciplinary tickets or violations. *** He's demonstrated that he can remain compliant with the rules and procedures of the Cook County Department of Corrections, which we would suggest translates into being able to abide by the rules and conditions that your Honor could set forth for him for potential release."

¶ 31     The State then provided a proffer that was substantially similar to the one provided at defendant's initial detention hearing. The State argued that the evidence showed defendant committed first degree murder, explaining that, although counsel suggested that there may be a self-defense or defense of others claim, the evidence was "irrefutable" that Victim One was shot in the back of the head, and that the women were facing away from defendant at the time he fired shots. The State also argued that defendant posed a real and present threat because he shot one victim in the back and the other in the back of the head, and that less restrictive conditions would

not mitigate defendant's dangerousness because they would not "prohibit the defendant from continuing this behavior."

¶ 32 In response, defense counsel argued that the State mentioned that Witness One was looking for her glasses, trying "to make this seem like this was some kind of innocent thing." Defense counsel stated, however, that Witness One lost her glasses during "a physical altercation with her brother just minutes before" she encountered defendant. Defense counsel also stated that the "videos and the reports" showed that defendant approached her and asked her if she needed help. "She says she doesn't need help from him, [and] he says 'fine, F you.' " Counsel continued:

> "and then she *** says, 'bro, [your] a*** will get killed right here.' He says, 'I'll spit on you, b***.'". The female then responds, '[your] a*** will lay right here, [your] a*** gonna die right here.' And she repeats this multiple times over the course of at least a couple of minutes while she's having this verbal altercation with *** the person they have identified as [defendant] on [the] scene and that individual is not raising his arms, he's not trying to instigate any fights, any physical altercations. The majority of the aggressive conduct as well as words that are being thrown around at this time are from [Witness One]."

¶ 33 Counsel stated that the situation was de-escalated "because [defendant] and his sister walk[ed] away." When defendant and the sister returned,

> "[Witness One] can then be seen also being held back by some of the witnesses on scene because she is getting physically aggressive during this situation. And it is true that you can hear that [Victim Two], who is the one that pulls out a firearm and points it at [defendant] and his sister, *** and says, just get the f*** off my property, and when she says that, they are leaving. The gun is still trained *** on

the people identified as [defendant] and his sister as they are walking away. \*\*\* [S]hortly after that is when shots rang out."

¶ 34    Defense counsel contended that this was not "an innocent incident [involving] some unarmed women." Rather, it was Witness One who got into a "physical altercation with a family member" and then started "getting aggressive with" and "issuing threats to kill" defendant.

¶ 35    In ruling, the court explained that its "role at this point is to determine only whether or not continued detention is appropriate. And without regurgitating what those original findings were, I do concur with them and I do find that continued detention is appropriate and that there are no least [*sic*] restrictive conditions at this time." The court explained that it had considered what counsel "offered in mitigation, and perhaps that is something that would be brought before the Court in some type of motion or just be presented in the defendant's defense of the charges before me, but as for today's hearing the motion for pretrial release is going to be denied."

¶ 36    On August 14, 2025, defense counsel filed a motion for relief. Counsel argued the State "failed to meet its burden" because "[t]he evidence is primarily circumstantial" and the circumstances of the shooting were "not without provocation on the part of the complainants and their associates on the evening in question," because defendant and his sister "were threatened immediately before the shooting by one of the individuals involved in this incident."

¶ 37    Defense counsel also argued that the State failed to prove that defendant posed a real and present threat because it "relied primarily on the nature of the offense." Counsel further asserted that the State failed to prove that there were no conditions that could mitigate his dangerousness, where defendant had "remained compliant with the court's no contact order," and he had "no infractions or violations and has received no discipline" while in the custody of the Cook County Department of Corrections.

9

¶ 38    The court held a hearing on defendant's motion for relief on August 27, 2025. Defense counsel briefly argued that the court's order for continued detention was "inappropriate," and otherwise "rested on the [written] motion." The State again reiterated the proffer, and argued that the court "correctly found that defendant should [continue to] be detained." In reply, defense counsel asserted that the State was "trying to paint the picture that *** there was no provocation" when the evidence showed that defendant had been threatened and had a gun pointed at him.

¶ 39    In ruling, the court stated that it was

> "still of the position that custody or detention is the most appropriate scenario under the full facts and circumstances in aggravation and mitigation as offered here today.
>
> I still do not find that there are any conditions or combination of conditions that would mitigate the safety risk that [defendant] poses. Furthermore, I do not think that any of those conditions would assure that he would comply with this Court's order or follow the rules of law.
>
> So, in light of that, your petition or motion is denied. Continued detention is warranted and so ordered. [Defendant] will remain in custody until further order."

¶ 40    Defendant filed a notice of appeal of the trial court's August 27, 2025 order, pursuant to Supreme Court Rule 604(h), which conferred jurisdiction on this court. See Ill. S. Ct. R. 604(h)(3) (eff. Apr. 15, 2024). In this court, defendant filed a memorandum pursuant to Rule 604(h)(7), to supplement the grounds set forth in his motion for relief, which defendant characterizes as:

> "(1) The State failed to meet its burden by clear and convincing evidence that the proof is evident or the presumption great that [defendant] committed a detainable offense; (2) the State failed to meet its burden of proving by clear and convincing

evidence that [defendant] poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case; and (3) the State failed to meet its burden of proving by clear and convincing evidence that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or person or the community based on the specific articulable facts of the case."

¶ 41   As an initial matter, we must clarify the scope of the issue that is before us in this appeal.

¶ 42   Defendant was initially ordered detained on November 20, 2024, and he did not appeal that order. Rather, six months later, on May 27, 2025, defendant filed a petition for pretrial release. After a continuing detention hearing, the trial court denied defendant's petition, finding that defendant's continued detention was warranted. Defendant's motion for relief was denied on August 27, 2025. In these circumstances, the propriety of the initial detention order is not before us. See *Hongo*, 2024 IL App (1st) 232482, ¶¶ 24-28. Rather, this appeal concerns the trial court's finding regarding defendant's continued detention. As explained below, the governing inquiry to assess the need for continued detention is distinct from the assessment required when the State initially seeks pretrial detention.

¶ 43   Pretrial release is governed by article 110 of the Code of Criminal Procedure of 1963 (Code), as amended by Public Act 101-652 (eff. Jan. 1, 2023), sometimes referred to as the Pretrial Fairness Act (Act). The Act "abolish[ed] traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release." *People v. Hongo*, 2024 IL App (1st) 232482, ¶ 20. "Section 110-6.1(e) of the Code presumes that all defendants are eligible for pretrial release and places the burden of justifying pretrial detention by clear and convincing evidence on the State." *People v. Stock*, 2023 IL (1st) 231753, ¶ 11; 725 ILCS 5/110-6.1(e) (West 2024).

¶ 44    For the State to obtain an initial detention order, the Act requires three showings by "clear and convincing" evidence:

> "For qualifying offenses, upon filing a verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence (1) that the proof is evident or the presumption great that a defendant has committed a qualifying offense (725 ILCS 5/110-6.1(e)(1) (West 2022)); (2) that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (725 ILCS 5/110-6.1(a)(1)-(7), (e)(2) (West 2022)) or a likelihood of willful flight to avoid prosecution (725 ILCS 5/110-6.1(a)(8), (e)(3) (West 2022)), and (3) that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or prevent the defendant's willful flight from prosecution (725 ILCS 5/110-6.1(e)(3) (West 2022))." *Hongo*, 2024 IL App (1st) 232482, ¶ 20.

¶ 45    After the initial pretrial detention hearing, the Act "also imposes a continuing obligation for the court to assess whether continued detention is necessary at subsequent appearances." *Id.*, ¶ 21. Specifically, at each subsequent appearance, the court must find that "continued detention is necessary to avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or to prevent the defendant's willful flight from prosecution." 725 ILCS 5/110-6.1(i-5) (West 2024).

¶ 46    "While the section 110-6.1(i-5) finding shares commonalities with the State's burden at a detention hearing, it is not identical." *People v. Thomas*, 2024 IL App (1st) 240479, ¶ 14. Rather than requiring the three elements necessary at an initial detention hearing, subsection (i-5) begins with the premise that the defendant's detention *was* necessary to guard against a threat and asks

whether anything has changed so that detention is no longer warranted. *Id.* At a continued detention hearing, the court's task is to determine whether new information has been presented that undermines the original conclusion that the defendant's detention was necessary to prevent a real and present threat, and suggests that the initial detention is no longer necessary. *Thomas*, 2025 IL App (1st) 250251-U, ¶ 25.

> " 'Although this determination necessarily entails consideration of the threat or flight risk posed by a defendant and the potential mitigation of such threat or flight risk by conditions of release, the [statute] does not require the court to again make specific findings that the State proved the three propositions by clear and convincing evidence as required at the initial hearing.' " *Hongo*, 2024 IL App (1st) 232482, ¶ 22 (quoting *People v. Casey*, 2024 IL App (3d) 230568, ¶ 13).

¶ 47    While the State is not required to repeatedly prove by clear and convincing evidence the three propositions required at the initial pre-trial detention hearing, it is required to provide a factual basis for the defendant's continued detention. *People v. Casey*, 2024 IL App (3d) 230568, ¶ 13. The "finding required by section 110-6.1(i-5) [for continued detention] is simply a less demanding standard than what is required at a detention hearing, though both are concerned with fundamentally the same question." *Thomas*, 2024 IL App (1st) 240479, ¶ 14.

¶ 48    Our supreme court has held that when the parties proceed by proffer, *de novo* review applies to appeals from initial detention decisions. *People v. Morgan*, 2025 IL 130626, ¶ 54 ("the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence.") "Some courts have also applied the supreme court's reasoning to continued detention hearings conducted by proffer, reviewing the circuit court's decision on continued detention *de novo*." *People v. Chavez*, 2025 IL App (1st)

251151-U (citing *People v. Brito*, 2025 IL App (1st) 242601-U). At least one other division of this district has found that despite *Morgan*, the abuse of discretion standard is applicable to continued detention determinations. See *People v. Mansoori*, 2025 IL App (1st) 250481-U. Additionally, one panel in the fourth district has also found the abuse of discretion standard applicable to decisions regarding continued detention, and the supreme court may soon decide the appropriate standard, having recently allowed a petition for leave to appeal in that case. See *People v. Post*, 2025 IL App (4th) 250598, ¶ 29, *appeal allowed*, No. 132403 (Nov. 21, 2025). Nevertheless, we need not decide the appropriate standard of review, as our decision would be the same regardless of the standard applied.

¶ 49    In this appeal, defendant first argues that the State did not meet its burden to show that he committed a detainable offense where the State's proffer "support[s] a finding of self-defense, not that he committed a detainable offense." Defendant contends that he "was not the initial aggressor," and that "he reasonably believed that he had to use a firearm to prevent imminent death or great bodily harm to himself or his sister."

¶ 50    First, the statutory provision regarding continued detention, section 110-6.1(i-5), simply "does not require a showing or finding that proof is evident or the presumption great that defendant committed a detainable offense." *Thomas*, 2024 IL App (1st) 240479, ¶ 14 (citing 725 ILCS 5/110-6.1(i-5) (West 2022)); see also *Hongo*, 2024 IL App (1st) 232482, ¶ 22 (the trial court is not required to "again make specific findings that the State proved the three propositions by clear and convincing evidence as required at the initial hearing.").

¶ 51    Moreover, even if such a showing were required, we would still find the State's proffer sufficient. According to the State's proffer, defendant and his sister had walked away from the second altercation with the women, Victim Two returned the firearm to her purse, and the women

14

were facing away from defendant at the time he fired shots upon them. This proffered evidence does not suggest that the defendant acted in self-defense. See *People v. Ellis*, 187 Ill. App. 3d 295, 302-03 (1989) (State disproved self-defense beyond a reasonable doubt when the victim left an initial altercation and went home, then the defendant retrieved a baseball bat and chased the unarmed victim for two blocks before beating him with the bat). Even the "new" evidence defense counsel raised at the August 27, 2025, hearing, regarding what counsel characterized as the women's "aggressive" conduct toward defendant, does not undermine that conclusion. Assuming *arguendo* that we accepted that defendant was not the initial aggressor, his actions in leaving the altercation and then shooting at the backs of the group of women would not be justified. See *People v. Thornton*, 26 Ill. 2d 218, 222 (1962) ("The right of self-defense *** does [not] allow the pursuit and killing of even an original aggressor after the aggressor abandons the quarrel.").

¶ 52    Defendant, however, contends that the "fact that the decedent was shot in the back of the head does not dispose of his self-defense claim." He cites no authority for this statement, and nonetheless, the State need not "dispose" of all affirmative defenses in order to meet its burden to show that a defendant should be detained. Even if a defendant has a viable self-defense argument, the State is required to disprove that defense at trial, not during a pretrial detention hearing. *People v. Smith*, 2024 IL App (2d) 240168, ¶ 31.

¶ 53    Defendant next argues that the trial court's finding of dangerousness was erroneous because the trial court "had the benefit of knowing that [defendant], eight months after his arrest, had never tried to contact any witness" and he had "complied with jail rules and regulations, never receiving a disciplinary violation." Relatedly, defendant also contends that the State "failed to meet its burden of proving that no condition or combination of conditions"—specifically, electronic or GPS monitoring, could mitigate the safety threat he poses, where he had "no history of violating

15

court orders or attempting to evade prosecution" and the court had "additional information" that defendant had been "compliant with jail directives."

¶ 54    We reiterate that, at a hearing on defendant's continued detention, the court is not required to again make the findings that were required at an initial detention hearing. *Hongo*, 2024 IL App (1st) 232482, ¶ 22. Rather, the court must determine whether any new information has been presented that undermines the original conclusion that the defendant's detention was necessary to prevent a real and present threat, and suggests that detention is no longer necessary. *Thomas*, 2025 IL App (1st) 250251-U, ¶ 25.

¶ 55    In this case, we find no new information to suggest that defendant is no longer a threat or that detention is no longer necessary. Although defendant has apparently conducted himself commendably while in custody, defendant's compliance with the no contact order and his lack of disciplinary violations do not outweigh other circumstances weighing in favor of his detention. The proffered evidence of the charged offense shows that defendant engaged in physical altercations with the women, and acted aggressively toward them. After the initial altercations ended, defendant fired shots at the backs of the victims. The shooting occurred on a residential Chicago street, with multiple onlookers. Defendant's record also shows that he has a previous conviction for misdemeanor UUW, and that he possessed a firearm without a FOID card or CCL. Defendant's history of access to firearms, and his willingness to possess firearms in violation of the law, provide further support for the conclusion that he is dangerous and should continue to be detained. See *Hongo*, 2024 IL App (1st) 232482, ¶ 36 ("Defendant's history of failing to abide by prior conditions of release placed upon him, by possessing a weapon while prohibited from doing so, further suggests that continued detention is necessary to avoid the safety risk posed by defendant.").

¶ 56    For the foregoing reasons, we affirm the denial of defendant's motion for relief seeking pretrial release.

¶ 57    Affirmed.